# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01384-COA

TERRY MILLER AND JOSEPH L. STONE, JR.           APPELLANTS

v.

BOARD OF TRUSTEES OF SECOND BAPTIST         APPELLEES
CHURCH OF STARKVILLE, AND ITS
CURRENT MEMBERS CHAIRMAN BENNIE
HAIRSTON, STEVE BROWN, MARVIN
PERKINS, PATRICK R. SWOOPES, AND ITS
FORMER MEMBERS ANTHONY COATS,
LINDA CORNELIUS, KIMBLE HILL, PERCY
NASH, DANNY RICE, CHRISTINIA
TOWNSEND AND JAMES WILLIAMS

| | |
|---|---|
| DATE OF JUDGMENT: | 11/20/2020 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | MATTHEW ALLEN BALDRIDGE |
| ATTORNEYS FOR APPELLEES: | DORSEY R. CARSON JR. |
| | LINDSAY KROUT ROBERTS |
| | KELLI MADISON SLATER |
| | KATHRYN PICKETT GOFF |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 04/25/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. The members of the Board of Trustees of the Second Baptist Church of Starkville (SBC) filed a lawsuit in circuit court against SBC's pastor, Joseph L. Stone Jr., and the chairman of SBC's Deacons, Terry Miller. The Trustees sought to recover damages from Stone and Miller, alleging, among other things, that they had breached their fiduciary duties

to SBC. Stone and Miller filed a motion to dismiss, arguing that the Trustees lacked authority to file the lawsuit because SBC's members had not authorized the suit. During a hearing on the motion, the parties agreed that a congregational meeting should be held to allow SBC's members to vote to approve or disapprove of the lawsuit. The meeting was held, and a majority of SBC's members voted to *disapprove* of the Trustees' lawsuit. But the Trustees then argued that they could maintain the lawsuit despite the congregational vote against it. The circuit court agreed with the Trustees and denied Stone and Miller's motion to dismiss. The case eventually proceeded to a jury trial. The jury returned a verdict for the Trustees, and the circuit court entered a judgment against Stone and Miller, jointly and severally, for $500,000 and against Stone individually for an additional $30,000.

¶2. On appeal, Stone and Miller argue that the judgment must be reversed and rendered because the Trustees lacked authority to file the lawsuit without the approval of SBC's members—and clearly lacked authority to maintain the suit after a majority of SBC's members voted against it. For the reasons explained below, we agree that the Trustees lacked authority to maintain the suit. Therefore, we reverse and render the judgment of the circuit court. Because that issue is dispositive, we need not address the additional issues that Stone and Miller raise on appeal.

## FACTS AND PROCEDURAL HISTORY

¶3. SBC was founded in 1871. It was incorporated as a Mississippi nonprofit corporation in 1993. Stone became SBC's pastor in 2010. Miller has been a deacon since at least 2010 and has been chairman of the Deacons since at least 2014.

¶4. SBC has had a constitution and bylaws since at least 2003. SBC's Constitution establishes that "[t]he officers of this church as supported by Scripture shall be the Pastor and Deacons." The plaintiffs in this lawsuit—the Trustees—are not "officers" of the church. Rather, the Trustees are designated among a group of "[o]ther vocational leaders" within the church. SBC's Constitution has detailed provisions regarding its members' "exclusive right of self-government," the members' right to vote on church business, and the duties and authorities of SBC's officers and other vocational leaders. These provisions are discussed in greater detail *infra*.

¶5. In 2011, SBC solicited bids from architects to design a new sanctuary. In February 2012, SBC hired the architecture firm of Pryor & Morrow. In May 2012, Donald Crowther, a contractor doing business as TCM Companies LLC, offered to provide "pre-construction" consulting services during the design phase of the project for only $1. TCM intended to bid on the construction project as well, although SBC would be under no obligation to hire TCM as the general contractor. During a congregational meeting in August 2012, Stone presented two recommendations to the congregation: (1) hire TCM as a consultant, and (2) accept a proposal for a $1,100,000 construction loan from Merchants & Farmers Bank. The Church's members voted to approve both recommendations.

¶6. In January 2013, four contractors submitted bids on the construction project. TCM's bid was the lowest, but none of the bids were within SBC's budget. In February 2013, Stone recommended to the congregation that SBC terminate its contract with Pryor & Morrow and form a building committee to work with TCM and a new architect to design a new sanctuary

3

within SBC's budget.

¶7. Stone supported hiring TCM as the general contractor, but SBC's Board of Trustees raised objections to multiple proposed contracts with TCM. At a congregational meeting on June 4, 2013, the Trustees presented their objections to the proposed contracts, and TCM and Stone also made presentations. Stone recommended that the congregation vote to execute the contract with TCM. A motion to execute the contract with TCM was made, seconded, and passed by a vote of 54–48. However, following the meeting, only one Trustee (Barbara Patrick) was willing to sign the contract. Therefore, Stone had the other Trustees' names removed from the contract's signature page, and Patrick and Crowther executed the contract between SBC and TCM on June 6, 2013. The next day, TCM deposited a $50,000 check from SBC. The check was dated May 13, 2013, and Stone had apparently delivered it to Crowther prior to the congregational meeting.

¶8. In July 2013, Merchants & Farmers Bank informed SBC that its commitment to make a construction loan had lapsed because some of SBC's Trustees had not signed the loan commitment letter.

¶9. In February 2014, at the Trustees' request, attorney Russell Rogers sent a letter to Crowther demanding that TCM return the $50,000 payment it had received from SBC. The letter alleged that no work had been done on the project and that TCM's contract was invalid because it was not signed by all the Trustees. In a responsive letter, Crowther asserted that the contract was valid, that TCM had performed work, and that TCM had suspended work at Stone's request "in order to allow [SBC] time to mend the wounds caused by months of

4

in-fighting." Crowther stated that TCM was "ready to resume work when so directed." At a congregational meeting in April 2014, the Trustees reported that the construction project was on "hold" until the "issue" with TCM's contract could be resolved.

¶10.    Stone subsequently began working with the Church's Deacons to resume construction. At all relevant times, Miller was the chairman of the Deacons. Stone stated that he began working with the Deacons because they were "the only people that seemed to want to get the will of the church done at that time." Stone and the Deacons also consulted with attorney Scott Colom. According to Stone, Colom advised them that SBC's contract with TCM was "valid" and that the Trustees should have signed it because SBC's members had specifically voted to execute it. Stone directed TCM to resume construction, and he began sending TCM's invoices to the Deacons. In 2014 and 2015, SBC paid TCM and its subcontractors approximately $400,000 (in addition to the $50,000 previously paid).

¶11.    In 2015, SBC applied for a construction loan from Renasant Bank to finance the completion of the project. As part of that process, Ken Collins of Construction Inspection Service LLC was retained to evaluate TCM's work. In October 2015, Collins concluded that the approximate value of the work in progress was only $217,301, far less than SBC had paid TCM and its subcontractors.

¶12.    On November 25, 2015, the Trustees filed suit against Crowther, TCM, Stone, and Miller in the Oktibbeha County Circuit Court. The complaint identified the plaintiffs as the "Board of Trustees of [SBC]," five current Trustees, and seven former Trustees. The complaint sought a temporary restraining order (TRO) to "enjoin Miller and Stone from

5

expending any further [SBC] funds without approval of the Board of Trustees." The complaint also sought a judgment declaring that TCM's contract was void and that Stone and Miller lacked authority under SBC's Constitution to contract with TCM or make or approve payments to TCM without the Trustees' approval. Finally, the complaint asserted multiple claims for damages of "not less than $400,000"—including claims for unjust enrichment and conversion against Crowther, TCM, and Stone; a claim for breach of fiduciary duty against Stone and Miller; a civil conspiracy claim against all defendants; and a breach of contract claim against TCM.

¶13. The same day the complaint was filed, the circuit court entered a TRO—without notice or a hearing—enjoining Stone and Miller from paying Crowther or TCM without the Trustees' approval.

¶14. On December 1, 2015, the Trustees filed an emergency motion for a TRO to prohibit any changes to SBC's Board of Trustees. The same day, the circuit court entered a TRO—without notice or a hearing—granting the requested relief.

¶15. On the evening of December 1, 2015, SBC held a special-call congregational meeting, although it is not clear that it complied with the notice requirements of SBC's Constitution. During the meeting, Stone distributed copies of several documents related to the Trustees' lawsuit, including the TROs issued by the circuit court. Stone recommended that the congregation (1) authorize Stone and Miller to hire an attorney to represent SBC in the lawsuit, (2) "clear the current [B]oard of [T]rustees for not carrying out the church's will and for disregarding the church's leadership protocol," and (3) not pay any litigation expenses

incurred by the Trustees. Motions were made and seconded to accept each recommendation, and the motions passed by votes of 63–56, 59–57, and 59–56, respectively.

¶16. On December 21, 2015, the Trustees served Stone and Miller with summonses and copies of the complaint.

¶17. On January 29, 2016, the Trustees filed a motion to hold Stone in contempt for violating the second TRO. The Trustees also filed a motion to extend both TROs "or in the alternative to grant [the Trustees] permanent injunctive relief."

¶18. On February 1, 2016, Stone and Miller answered the complaint and filed motions to have both TROs declared void ab initio or dissolved. Stone and Miller pointed out that the Trustees' motions for TROs failed to comply with Mississippi Rule of Civil Procedure 65(b) because, among other things, they were not supported by a verified complaint or affidavit, and the Trustees' attorney did not certify in writing what efforts had been made to give notice or why notice should not have been required. Stone and Miller also noted that even if the TROs were valid when entered, each had expired ten days after it was issued pursuant to Rule 65(b). Stone and Miller also argued that the TROs were unconstitutional because they impermissibly interfered with matters of internal church governance.

¶19. On the same day, Stone and Miller also filed a motion to dismiss the lawsuit for lack of standing and subject matter jurisdiction. They argued that the Trustees had no authority to bring the lawsuit under SBC's Constitution. They also argued that the Trustees lacked standing and that the Trustees' claims would require the court to resolve "ecclesiastical disputes" in violation of the First Amendment to the United States Constitution.

7

¶20.   A hearing on the parties' motions began on March 22, 2016, and continued on April 11, 2016, and June 9, 2016.  On June 9, counsel for the Trustees requested a continuance to allow the Trustees to discuss a possible settlement with TCM and Crowther.  In response, counsel for Stone and Miller argued that the Trustees lacked the authority to settle SBC's claims against Crowther and that any settlement would require a vote of SBC's members. Counsel also stated that SBC's members had never authorized the Trustees' lawsuit against Stone and Miller and that SBC's members should vote on that issue.  The court then suggested that during the continuance requested by the Trustees, a congregational meeting should be held for SBC's members to vote on whether to approve the Trustees' lawsuit. Following additional discussions, all parties agreed to the court's proposal.  The parties also agreed on the basic framework for the congregational meeting, that secret ballots would be used, and that former circuit judge Robert Gibbs would moderate the meeting.

¶21.   Subsequently, the parties were unable to agree on the specific questions to be submitted to the congregation for a vote.  Stone and Miller proposed a ballot that would have asked the members to vote separately on whether they approved of the filing of the lawsuit against (1) Stone, (2) Miller, and (3) TCM and Crowther.  However, the Trustees objected to Stone and Miller's proposal, arguing that "only one lawsuit was filed, and there is only one lawsuit for [SBC] to ratify.  Either the Board [of Trustees] has congregational approval for its lawsuit from the congregation, or it does not."  The circuit court agreed with the Trustees and instructed the parties to use the Trustees' proposed ballot, which required the members to vote yea or nay on the complaint as a whole.

¶22. On August 2, 2016, SBC held a congregational meeting, with Judge Gibbs serving as the moderator. A video of the meeting is in the record. During the meeting, some members indicated that they approved of the claims against TCM and Crowther but did not want to sue Stone or Miller. However, that was not an option on the Trustees' court-approved ballot. The Trustees allege that Stone took control of the meeting and departed from the agreed-upon agenda. However, the video of the meeting shows that Stone spoke first and then left the meeting, as the parties had agreed, and the Trustees then made a presentation and answered questions from the audience. Although there were some disruptions, Judge Gibbs maintained order and conducted the meeting substantially as the parties had agreed.

¶23. At the conclusion of the meeting, a majority of the members present voted by secret ballot to *disapprove* of the Trustees' lawsuit. The Trustees' ballot asked the members to vote on two issues: (1) whether to approve of the action of the Trustees in filing the complaint, and (2) whether to approve of the filing of a proposed amended complaint. The proposed amended complaint would have named additional defendants affiliated with Crowther who allegedly received money that belonged to the Church. SBC's members disapproved of the Trustees' filing of the lawsuit by a vote of 106–83, and they disapproved of the proposed amended complaint by a vote of 101–86.

¶24. Following the meeting, Stone and Miller filed a supplemental motion to dismiss based on the results of the congregational vote. Crowther and TCM also filed a motion to dismiss based on the vote. In response, the Trustees argued that they had the authority to continue to prosecute the lawsuit despite the members' majority vote disapproving of it. In September

9

2016, the court entered one-page orders denying the motions to dismiss as "not well-taken." The court also extended its TRO prohibiting any changes to the membership of the Board of Trustees until the conclusion of the case.[1]

¶25.   In February 2017, attorney Matt Baldridge entered an appearance on behalf of SBC, and in June 2017, SBC filed a motion to intervene.  SBC sought to intervene because the court had refused to dismiss the lawsuit despite its members' majority vote disapproving of the suit.  SBC stated that while it had "an interest in seeking recourse against TCM and . . . Crowther," it had no interest in suing its own pastor or the chairman of its Deacons.  In addition, SBC did not want to pay the Trustees' lawyers to sue Stone and Miller.  SBC stated that a majority of its members had voted to retain counsel to represent SBC's interest in the litigation.  Baldridge also sent a letter to the Trustees' attorney, Dorsey Carson, demanding that Carson return more than $80,000 that SBC had already paid to Carson's law firm.  The Trustees opposed SBC's motion to intervene, and in July 2017, the court denied the motion, finding that counsel for the Trustees and counsel for Stone and Miller could adequately represent SBC's interests.

¶26.   In July 2020, the Trustees, TCM, and Crowther filed a joint motion to dismiss TCM and Crowther without prejudice.  The Trustees stated that they had also sued TCM in a separate lawsuit pending in the same court, and they desired to pursue their claims against

---

[1] Crowther and TCM filed a petition for interlocutory appeal, but a panel of the Supreme Court denied the petition. *See Crowther v. Bd. of Trs. of Second Baptist Church of Starkville*, No. 2016-M-01435-SCT (Miss. Jan. 13, 2017) (order).  Stone and Miller also filed a petition for interlocutory appeal, but a panel of the Supreme Court dismissed their petition because it was not timely filed. *See Stone v. Bd. of Trs. of Second Baptist Church of Starkville*, No. 2016-M-01460-SCT (Miss. Jan. 13, 2017) (order).

TCM and Crowther in that action. The Trustees also stated that Crowther was "the subject of a criminal matter involving his actions pertaining to the damages sustained by [SBC]" and that "restitution to [SBC] would likely be a part of any" criminal plea or sentence. The Trustees subsequently settled their claims against TCM. Testimony at trial indicated that TCM's insurer paid $280,000 to settle the claims, although the record does not disclose the specific terms of the settlement. During trial, outside the presence of the jury, the court mentioned that Crowther had "pled guilty to a felony" and was awaiting sentencing, but the record does not disclose the terms of Crowther's plea.

¶27. Accordingly, the present case proceeded to trial against Stone and Miller only. Prior to trial, Stone and Miller renewed their motion to dismiss, arguing that the Trustees lacked authority to maintain the lawsuit after a majority of SBC's members had specifically voted against it. The court denied the motion, and a jury trial was held from October 19, 2020, through November 4, 2020.

¶28. At the time of the trial, Stone was still SBC's pastor, and Miller was still the chairman of the Deacons. Stone and Miller testified as adverse witnesses during the Trustees' case-in-chief and chose not to call any witnesses after the Trustees rested their case. In addition to fact witnesses, the Trustees called Ken Lefoldt, a certified public accountant, to testify regarding SBC's alleged damages. Lefoldt opined that "[t]his dispute . . . has resulted in obviously some loss of memberships and loss of contributions over th[e] last . . . few years." Specifically, he opined that SBC had experienced a "loss of contributions" of $391,492 as a result of the dispute. He also opined that SBC had expended $613,995 on construction

11

costs. Thus, Lefoldt opined that SBC's total damages were $1,005,487.

¶29. At the close of the evidence, the court instructed the jury on the Trustees' claims for breach of fiduciary duty and civil conspiracy against Stone and Miller and unjust enrichment against Stone. The jury found for the Trustees on all claims and found that they were entitled to recover $500,000 for breach of fiduciary duty and civil conspiracy and an additional $30,000 for unjust enrichment. The trial court entered a final judgment on the jury verdict against Stone and Miller, jointly and severally, for $500,000 and against Stone individually for an additional $30,000. Stone and Miller appealed.

## ANALYSIS

¶30. On appeal, Stone and Miller argue that the Trustees lack the authority to maintain this lawsuit because SBC's members never authorized it and later specifically voted against it. We agree and reverse and render the judgment for that reason. Because this issue is dispositive, we do not address the other issues that Stone and Miller raise on appeal.[2]

¶31. SBC's Constitution makes clear the church is a "democratic" and essentially majoritarian institution governed by its members. Article 3 states,

> This is a sovereign and *democratic* Baptist Church under the Lordship of Jesus Christ. *The membership retains until itself the exclusive right of self-government in all phases of the spiritual and temporal life of this church.*

(Emphasis added).

¶32. Article 5 of the Constitution states,

---

[2] Stone and Miller also challenge the legal sufficiency and weight of the Trustees' evidence and argue that the circuit court erred by denying SBC's motion to intervene, by admitting certain evidence, and by giving certain jury instructions.

> In case of a difference of opinion in the church, we will strive to avoid a contentious spirit, and if we cannot unanimously agree, *we will cheerfully recognize the right of the majority to govern*.

(Emphasis added).

¶33. Article 6 provides that regular quarterly "business meetings" shall be held "for the disposition of all business matters not otherwise provided for, to hear reports from the various church organizations and to consider other matters essential to the spiritual welfare and prosperity of the congregation." In addition, special "meetings may be called to consider matters of a specific nature and significance." All meetings are conducted according to *Robert's Rules of Order*, all members in attendance are entitled to vote, and "[a]ll votes shall be valid and final with no other action necessary." Finally, Article 7 reiterates that "[t]he government of this church is vested in the body of believers who compose it."

¶34. In summary, SBC's Constitution makes clear that its form of government is the type common among Baptist churches. As our Supreme Court repeatedly has recognized, "[t]he government of the Baptist church is with its members. Its form of government is congregational and democratic." *Allen v. Roby*, 109 Miss. 107, 112, 67 So. 899, 900 (1915); *accord Sawyer v. Brandon*, 825 So. 2d 26, 34 (¶17) (Miss. 2002); *Blue v. Jones*, 230 So. 2d 569, 570 (Miss. 1970); *Windham v. Ulmer*, 102 Miss. 491, 494, 59 So. 810, 810 (1912).

¶35. SBC's Constitution also provides in Article 8 that "[t]he officers of this church as supported by Scripture shall be the Pastor and Deacons." The plaintiffs in this lawsuit—the Trustees—are not "officers." Rather, the Trustees are designated among a group of "[o]ther vocational leaders" in the church. Article 9 describes the role and duties of the Trustees

13

within the church:

> **Section 3** – Trustees – The church shall elect not less than five bondable trustees who have demonstrated good business judgment to serve as legal officers . . . . They shall hold in trust the church's property. *Upon a specific vote of the church authorizing each action*, they shall have the power to buy, sell, mortgage, lease or transfer any church property. *When the signatures of trustees are required*, they shall sign legal documents involving the sale, mortgage, purchase or rental of property, or other legal documents *related to church approved matters*. The trustees shall have the power to keep all church property in good condition. In event of an emergency, trustees shall have the power to make whatever repairs or adjustments necessary and report it to the church at its next regular church meeting.

(Emphasis added).

¶36.    Reading SBC's Constitution as a whole, it is evident that the Trustees do not possess the authority to file tort lawsuits for damages against the church's officers without the approval of the church's members. It is even clearer that the Trustees do not have the authority to maintain such a lawsuit after a majority of the members have voted specifically to disapprove the suit. The Trustees' authority to "sign legal documents" is not a broad power to commence lawsuits or file pleadings without the members' approval—or, as in this case, despite the members' disapproval. Rather, the Trustees are charged with a mandatory duty to sign legal documents (i.e., they "shall sign") only when their signatures are needed for "*church approved matters.*" (Emphasis added). Put simply, the trustees have a duty to "sign legal documents" *when the church's members direct them to do so*.[3]

¶37.    Accordingly, the circuit court erred by not dismissing the lawsuit after a majority of

---

[3] *See Sawyer*, 825 So. 2d at 36 ("[Trustees] must execute legal papers in the name of the church when a purchase, transfer or sale has been ordered by the authority of the church. They are the custodians of church papers and titles, but can only exercise the power vested in them by vote of the church." (quoting *The Baptist Standard Church Directory*)).

SBC's members voted against it. SBC's Constitution makes clear that it is a "democratic" institution, that its "membership retains until itself the exclusive right of self-government in all phases of the spiritual and temporal life of this church," and that "the majority" have "the right . . . to govern" in the event of disagreement. The Trustees have no authority under SBC's Constitution to maintain a lawsuit against the church's officers after a majority of the Church's members have specifically voted against the suit. Because the Trustees lacked authority to maintain this lawsuit against Miller and Stone, the judgment in favor of the Trustees and against Miller and Stone must be reversed and rendered.

¶38. We also note that although Stone and Miller fail to develop a constitutional argument on appeal, this case does raise significant constitutional issues. For one thing, the Mississippi Supreme Court has held that civil "courts may not consider whether [church officers'] management or administrative decisions were fiscally irresponsible, or whether those decisions were in the best interests of parishioners." *Schmidt v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 829-30 (¶40) (Miss. 2009). Pursuant to the Religion Clauses of the First Amendment to the United States Constitution, civil courts simply cannot exercise jurisdiction over or adjudicate such claims. *Id.* at (¶¶38-40). Yet, in this case, the jury was instructed to return a verdict against Stone and Miller if the jury found that Stone and Miller breached a "Fiduciary Duty of Care" to SBC by failing to

- "take reasonable steps to protect the Church's property";

- "carry out [their] responsibilities in an informed, prudent manner";

- "act as an ordinary prudent person would act in the management of affairs";

15

- "administer the Church's property as a prudent person would"; or

- "exercise reasonable care, skill, and caution."

Imposing liability on these bases appears inconsistent with the Supreme Court's holding in *Schmidt*. Moreover, a congregation's decision not to sue its own pastor or deacon has fairly obvious doctrinal or "ecclesiastical" implications.[4] Therefore, courts should be extremely wary of entertaining these types of claims against a church's officers, especially over the express objection of a majority of the church's members.

¶39. However, it is unnecessary for us to reach any state or federal constitutional issues in this case.[5] Rather, for the reasons explained above, we decide the case on the narrower ground that the Trustees lack authority to maintain this lawsuit *under their own church's constitution*. For that reason, the judgment of the circuit court is **REVERSED AND RENDERED**.

**CARLTON, P.J., LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. WESTBROOKS AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. BARNES, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE AND McDONALD, JJ.**

---

[4] *See* 1 *Corinthians* 6:1, 4-7 (ESV) ("When one of you has a grievance against another, does he dare go to law before the unrighteous instead of the saints? . . . So if you have such cases, why do you lay them before those who have no standing in the church? I say this to your shame. Can it be that there is no one among you wise enough to settle a dispute between the brothers, but brother goes to law against brother, and that before unbelievers? To have lawsuits at all with one another is already a defeat for you. Why not rather suffer wrong? Why not rather be defrauded?").

[5] *See, e.g., Hood ex rel. State Tobacco Litig.*, 958 So. 2d 790, 812 (¶76) (Miss. 2007) ("This Court has steadfastly adhered to the rule that we will abstain from ruling on a constitutional issue unless such determination is necessary to a disposition of the case.").

**BARNES, C.J., DISSENTING:**

¶40. I dissent from the majority's determination that the Trustees[6] lacked standing to file the lawsuit against the Appellants, Stone and Miller. Further, I find the Appellants' remaining allegations of error either lack merit or have been waived on appeal.[7] Accordingly, I would affirm the judgment.

## I. Standing/Subject-Matter Jurisdiction

¶41. The majority concludes that SBC's Constitution, when read as a whole, did not confer upon the Trustees "the authority" (i.e., standing) to file a civil action "against the church's officers without the approval of the church's members." "Standing is an aspect of subject matter jurisdiction." *Hobson v. Chase Home Fin. LLC*, 179 So. 3d 1026, 1031-32 (¶17) (Miss. 2015) (quoting *SASS Muni-V LLC v. DeSoto County*, 170 So. 3d 441, 445 (¶12) (Miss. 2015)). "The existence of subject-matter jurisdiction turns on the well pleaded allegations of the complaint which are taken as true." *Id.* (internal quotation marks omitted) (quoting *SASS Muni-V*, 170 So. 3d at 445 (¶12)).[8]

¶42. I disagree with the majority's holding. As stated in the complaint, "[p]ursuant to its

---

[6] The "Trustees" refers to the plaintiffs/appellees in the context of the litigation. I will refer to the "Board" or "trustees" when referencing the trustees operating in their role with the church and under the terms of its Constitution.

[7] Any pertinent underlying facts related to the other issues raised on appeal will be included in the analysis of them.

[8] I find the congregation's subsequent vote is not relevant to the issue of the Trustees' standing here, as "standing is to be determined as of the commencement of suit." *Delta Health Grp. Inc. v. Est. of Pope ex rel. Payne*, 995 So. 2d 123, 126 (¶13) (Miss. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 (1992)). The congregational vote occurred months after the filing of the suit.

Constitution and By-Laws, . . . SBC's Board of Trustees is comprised of not less than five (5) elected and bondable trustees empowered to 'hold in trust the church's property'; 'to buy, sell[,] mortgage, lease or transfer any church property' upon a vote of the church; and to 'sign legal documents involving the sale, mortgage, purchase or rental of property, or other legal documents related to church approved matters.'" While Article 9, Section 3 of SBC's Constitution requires "a specific vote of the church" to authorize the trustees' power "to buy, sell[,] mortgage, lease or transfer any church property," the Constitution does not state that the congregation's approval is required for the trustees to perform any duties beyond those stated matters.

¶43.   The SBC Constitution further provides that trustees are "to serve as legal officers, . . . to hold in trust the church's property[,] . . . [and] shall have the power to keep all church property in good condition." Article 2 also vests "title to all property . . . in the church trustees." This language thereby imposes upon the trustees not only the authority, but the responsibility, to hold in trust the church's property, "both real and personal." The United States Supreme Court has held that "[o]ne of the fundamental common-law duties of a trustee is to preserve and maintain trust assets[.]" *Cent. States Se. & Sw. Areas Pension Fund v. Cent. Transp. Inc.*, 472 U.S. 559, 572 (1985).

¶44.   As the Trustees have asserted, the SBC Constitution grants them certain "fiduciary duties and those corresponding responsibilities." Therefore, the Trustees had a duty—both through the language in the Constitution, as well as the common law—to protect SBC assets, and any failure to protect SBC's assets may well have been a dereliction of the trustees'

18

fiduciary duties under the SBC Constitution. Given their stated concerns that TCM Companies LLC (TCM) had been given "access to [SBC's] private meetings and financial information" through TCM's representative Donald Crowther and that "Stone and Miller were improperly biasing the bidding process in favor of TCM," the trustees understandably were reluctant to execute the contract with TCM. The complaint further alleged that Stone had "urge[d] the Board of Trustees to sell other SBC property to cover TCM's fees and cover SBC's loans," so the Trustees requested injunctive relief to prevent Miller and Stone from "improperly expending SBC funds without proper authorization." In light of Crowther's prior conviction for bribery, and his later admitting that he submitted fraudulent invoices for reimbursement,[9] it is evident that the Trustees had ample reason to believe that a lawsuit was necessary to protect SBC's property. *See* 76 Am. Jur. 2d *Trusts* § 402 (updated Feb. 2023) ("To perform this duty, the trustee must make the trust property productive and must not suffer the estate to waste or diminish or fall out of repair." (footnote omitted)). It was also later revealed that SBC deacons, contrary to the Constitution, had been diverting church collections into a separate bank account to avoid oversight by the Trustees or the SBC treasurer.

¶45. Generally, "Mississippi parties have standing to sue 'when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law.'" *Schmidt v. Cath. Diocese of Biloxi*, 18 So. 3d 814, 826-27 (¶33) (Miss. 2009) (quoting *City of Picayune v. S. Reg'l Corp.*,

---

[9] Crowther was subsequently charged and pled guilty to a felony (fraud).

19

916 So. 2d 510, 525 (Miss. 2005)). "It is well settled that Mississippi's standing requirements are quite liberal." *Gray Properties LLC v. Util. Constructors Inc.*, 168 So. 3d 1164, 1167 (¶9) (Miss. Ct. App. 2014) (quoting *Hall v. City of Ridgeland*, 37 So. 3d 25, 33 (¶24) (Miss. 2010)). As SBC's appointed "legal officers" under the church's Constitution, the Trustees not only had a "colorable interest in the subject matter of the litigation" and "experience[d] an adverse effect from the conduct of the defendant[s]," they had the authority to file the lawsuit to protect SBC's assets.[10]

¶46.    I also find no merit to the Appellants' argument that the circuit court lacked subject-matter jurisdiction. In cases involving church-property disputes, Mississippi has adopted the "neutral principles of law" approach, which "relies on objective, traditional concepts of trust and property law . . . [and] calls for the completely secular examination of deeds to the church property, state statutes[,] and existing local and general church constitutions, by-laws, canons, Books of Discipline[,] and the like." *Id.* at 824 (¶23) (quoting *Church of God Pentecostal Inc. v. Freewill Pentecostal Church of God Inc.*, 716 So. 2d 200, 206 (¶18) (Miss. 1998)). In *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213 (Miss. 2005), the supreme court recognized "that the cloak of religion . . . does not shield religious

_____

[10] As the Trustees reason, "the Trustees either have standing to bring suit against <u>all</u> Defendants to protect the SBC property, or they had no standing to proceed against <u>any</u> Defendant." The ballot from the August 2016 meeting shows that the members were allowed to vote on whether to accept a proposed settlement with TCM and Crowther. Although the record indicates that 91 voted yes, 99 voted no, Hairston later testified at trial that there was a settlement from Crowther and TCM for $280,000 that they were "waiting for everything to clear." While the Appellants argue that "[t]he bylaws do not allow the Church to file a lawsuit without the approval of the congregation," they have not challenged the Trustees' authority to accept the settlement from Crowther and TCM.

institutions from civil responsibility for fraud or breach of contract[.]" *Id*. at 1237 (¶74) (addressing the United States Supreme Court's holding in *Gen. Council on Fin. and Admin. of the United Methodist Church v. Sup. Court of Cal.*, 439 U.S. 1355, 1372-73 (1978)). Specifically, *Morrison* found the "Doctrine of Church Autonomy" did not offer "blanket protection of the Church" from a plaintiff's civil claims, which included breach of fiduciary duty and civil conspiracy. *Id*. at 1236 (¶68); *see also Schmidt*, 18 So. 3d at 831-32 (¶¶46-50) (holding the trial court had subject-matter jurisdiction over parishioners' "common-law tort" claim of intentional fraudulent misrepresentation against priest because the claim could be "decided on neutral principles of law without excessive entanglement in ecclesiastical affairs").

¶47. Therefore, "[w]hile churches have large, almost-unfettered discretion in their administrative decision-making, they are not entitled to violate recognized duties or standards of conduct." *Schmidt*, 18 So. 3d at 830 (¶41). The Trustees note that the "lawsuit . . . never had any bearing on [Stone's] fitness to preach or continue in his role as pastor of SBC." Rather, the lawsuit's "sole aim is and always has been to preserve and recover Church funds[,] which were wasted on a poorly[]constructed and incomplete renovation project[.]" As in *Morrison*, the claims brought against the Appellants in this case are breach of fiduciary duty and civil conspiracy, as well as unjust enrichment. Because the basis for this civil action did not present a doctrinal dispute requiring this Court to address "ecclesiastical" matters, I find the court had subject-matter jurisdiction.

## II.     Other Issues on Appeal

21

¶48. I find the remaining claims raised by the Appellants either lack merit or have been waived on appeal.

### A. Motion to Intervene

¶49. On June 26, 2017, SBC filed a motion to intervene.[11] Mississippi Rule of Civil Procedure 24(a)(2) provides, in pertinent part:

> Upon timely application, anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, *unless the applicant's interest is adequately represented by existing parties.*

(Emphasis added). The circuit court denied SBC's motion to intervene, finding SBC's "interests [were] well protected" by the attorneys representing the Trustees and the Appellants.

¶50. The Appellants argue that "SBC had an interest in protecting its duly elected pastor and deacon[,] . . . its autonomy[, and] . . . its right to self-govern[,] and [that] SBC had a right to enforce a majority vote by its members not to pursue the litigation." A court's decision whether to allow a Rule 24(a) intervention as a matter of right is reviewed de novo. *Madison HMA Inc. v. St. Dominic-Jackson Mem. Hosp.*, 35 So. 3d 1209, 1215 (¶19) (Miss. 2010). In *Madison HMA Inc.*, the supreme court recognized that "[i]n order to intervene as a matter of right, a movant must: '(1) make timely application, (2) have an interest in the subject matter of the action, (3) be so situated that disposition of the action may as a practical matter impair or impede his ability to protect his interest, and (4) his interest must not already be adequately

---

[11] SBC's attorney Matthew Baldridge now represents the Appellants on appeal.

22

represented by existing parties." *Id*. at 1215 (¶19). Here, there was a nineteen-month delay between the filing of the suit and the filing of SBC's motion to intervene—a significant delay for which SBC provided no explanation. *See Vasser v. Bibleway M.B. Church*, 50 So. 3d 381, 387 (¶23) (Miss. Ct. App. 2010) (Where timeliness of the application to intervene is an issue, "[t]he intervenor bears the burden . . . to establish a reason for the delay[.]") (quoting 59 Am. Jur. 2d *Parties* § 233 (2002))). SBC merely argued in its motion that neither party would be prejudiced by the intervention.

¶51. The circuit court determined that SBC's interests were "adequately represented by existing parties." The burden was on SBC, as the intervenor, to establish inadequate representation. "[I]f the [intervenor's] interest is identical to that of one of the present parties, or if there is a party charged by law with representing [its] interest, then a compelling showing should be required to demonstrate why this representation is not adequate." 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1909 (3d ed. Supp. 2022) (Wright & Miller). SBC conceded that its interests were "aligned" with Stone in the litigation, and the Trustees were acting on behalf of SBC as its elected "legal officers." I therefore find no error in the court's denial of the motion to intervene.

### B.     *Testimony Regarding Redirected Church Collections*

¶52. Appellants' counsel objected to trustee chairperson Bennie Hairston's testimony that church collections were redirected to separate Wood Forest banking accounts, that a police report was filed against Miller, and that the court had ordered the SBC deacons to return the

redirected money to SBC. The circuit court judge overruled the objection, noting that during pretrial hearings, he had "ma[d]e it clear that all this stuff would come out at trial." The judge further ruled that the testimony was "relevant" evidence as "all part of a continuing operation," and he noted that "there are reams of e-mails that indicate that the deacons and Mr. Miller, being a deacon, and Pastor Stone had gotten outside of their lane, if you will." Although Appellants' counsel continued to argue that the evidence was "[Mississippi Rule of Evidence] 403 prejudicial," the judge concluded that the jury would "have to decide what they give credit to and what they don't."

¶53. The Appellants now argue that this testimony was not only prejudicial but irrelevant "to the issues presented at trial and [that] no foundation was given to make it relevant." They specifically note that "the jury awarded damages in the amount of $ 30,000, [and] . . . [t]he only time $30,000 was mentioned during the trial was in relation to how much of the offerings were not returned." This argument refers to Hairston's testimony that the court had ordered the deacons to return redirected money, which was "somewhere between the tune of 20 to $30,000." The Appellants further contend that the testimony "poisoned the jury's mind and its ultimate decision regarding [the Appellants'] culpability as to conspiracy and breach of fiduciary duty."

¶54. "Evidentiary rulings are within the broad discretion of the trial court and will not be reversed absent an abuse of discretion." *Redhead v. Entergy Miss. Inc.*, 828 So. 2d 801, 806 (¶7) (Miss. Ct. App. 2001) (quoting *Dobbs v. State*, 726 So. 2d 1267 (¶25) (Miss. Ct. App. 1998)). "[I]f the evidence has any probative value, [Mississippi Rule of Evidence 401]

24

favors admission." *Id*. at 807 (¶16). I find the testimony regarding the redirected church collections was relevant to the claims addressed at trial. The testimony showed—as asserted by the Trustees—"wrongful possession of the church's property, which should have been in the possession of the treasurer and finance committee pursuant to the church's [C]onstitution." The Trustees further note the evidence was relevant to demonstrate that Stone put "his own interests above those of the church, in breach of his fiduciary duty." Lastly, as stated in the circuit court's ruling, the testimony was relevant to the civil conspiracy claim because it showed the Appellants engaging in a "continuing operation." *See Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (¶33) (Miss. Ct. App. 2013) (noting that "an agreement between the parties" may be established "based on evidence of a course of conduct"). Affording the circuit court "broad discretion" in ruling on the admissibility of this evidence, I find no error.

### C. The Appellants' Motion for a Directed Verdict

¶55. The Appellants claim the circuit court erred in denying their motion for a directed verdict on the claims for unjust enrichment (as to Stone), breach of fiduciary duty, and civil conspiracy. A trial court's grant or denial of a motion for directed verdict is reviewed de novo on appeal. *Moreno v. TLSL Inc.*, 187 So. 3d 127, 129 (¶8) (Miss. 2016). In deciding whether to grant the motion, the circuit court "is to look solely to the testimony on behalf of the party against whom a directed verdict is requested[,] . . . [taking] such testimony as true along with all reasonable inferences which can be drawn from that testimony which is favorable to that party." *Solanki v. Ervin*, 21 So. 3d 552, 556 (¶8) (Miss. 2009) (quoting

*White v. Thomason*, 310 So. 2d 914, 916-17 (Miss. 1975)). "If reasonable minds might differ as to this question, it becomes a jury issue." *Id*. However, "[i]f the evidence is sufficient to support a verdict in favor of the non-moving party, the trial court properly denied the motion." *Moreno*, 187 So. 3d at 129 (¶8) (quoting *Henson v. Roberts*, 679 So. 2d 1041, 1044-45 (Miss. 1996)).

### i.     *Unjust Enrichment*

¶56.   A claim of unjust enrichment, which is an equitable remedy, is applicable in those "situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another[.]" *Hughes v. Shipp*, 324 So. 3d 286, 290 (¶12) (Miss. 2021). At trial, counsel for the Appellants argued that there was "no testimony of any direct payments from Crowther or TCM to Pastor Stone, no kick-backs to him" and that the Trustees had not shown Stone possessed any monies "he should not retain and deliver to another such as those payments that were made to TCM[.]" The Trustees' counsel responded that there was evidence that some payments to TCM "were procured by misrepresentations by Mr. Stone" and that there "has been a benefit to [Stone] to the detriment of [the Trustees and SBC]." The court granted the motion for directed verdict as to Miller but denied the motion as to Stone. The court also noted that "it becomes a jury issue as to whether there was, in fact, a contract or at least a lawful contract."

¶57.   The Appellants argue that there was no evidence demonstrating that Stone "had money or property which in good conscience and justice he should not have retained but

26

should deliver to another." Stone denied ever receiving any money or "kickbacks" from Crowther or TCM, but he did admit that he received private "love offering" donations from the congregation to his CashApp account that did not go to the church. There was also evidence that he took control of the building project after the trustees challenged the validity of the TCM contract.

¶58. The Trustees acknowledge that this claim is based on "several instances of circumstantial evidence," which include

> (1) significant amounts of cash coming out of Don Crowther's accounts at the same time he received a $50,000 payment; (2) an influx of cash flow into Stone's bank account following Crowther's receipt of that payment; (3) Stone purchased two cars shortly after this cash left Crowther's accounts; (4) Stone regularly collected cash payments; (5) Stone has a Cash App account under the name SBC Pastor under which he solicits offerings but does not report those to the finance committee.

The Trustees also note that Stone's personal bank statements, which showed "influxes of cash flow that were consistent with Crowther's payment for work that was never performed[,] provide enough substantial evidence to lead a reasonable jury to believe he was unjustly enriched to the detriment of SBC." There was evidence of money orders or cash deposits put into Stone's personal bank account in 2013, around the time that the first payments were made to TCM. Regarding the "love offerings" deposited into Stone's CashApp account, SBC's Constitution provides that "[a]ll funds received for any and all purposes shall pass through the hands of the church treasurer and be properly recorded on the books of the church." Stone contended at trial, however, that those private "love offerings" did not have to go through the church, noting that "would be between [him] and

27

the IRS."[12]

¶59.    The testimony and evidence concerning the claim for unjust enrichment raised questions of fact for the jury in this instance.  Viewing the evidence "in the light most favorable" to the Trustees, I find no error in the court's denial of the motion for a directed verdict as to the claim of unjust enrichment against Stone.

### ii.    Breach of Fiduciary Duty

¶60.    "[A] fiduciary duty must exist before a breach of the duty can occur."  *Gibson v. Williams, Williams & Montgomery P.A.*, 186 So. 3d 836, 851 (¶50) (Miss. 2016) (quoting *Baker Donelson Bearman Caldwell & Berkowitz P.C. v. Seay*, 42 So. 3d 474, 485 (¶29) (Miss. 2010)).  The supreme court has further held:

A fiduciary duty is established:

> Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.

*Mabus v. St. James Episcopal Church*, 884 So. 2d 747, 758 (¶23) (Miss. 2004), aff'd, 13 So. 3d 260 (Miss. 2009) (quoting *Mullins v. Ratcliff*, 515 So. 2d 1183, 1191 (Miss. 1987)).  The determination of "the existence of a fiduciary relationship is a question of fact."  *Saucier v. Peoples Bank of Biloxi*, 150 So. 3d 719, 725 (¶23) (Miss. Ct. App. 2014).  Regarding the claim for breach of fiduciary duty, Appellants' counsel argued that there was no "proof shown that [Stone and Miller] didn't act in the best interest of the church based on the

---

[12] The SBC Constitution makes no provision for private "offerings" to the pastor.

knowledge that they had at the time."

¶61.   Stone's role as pastor and "presiding officer for all church business meetings" established a fiduciary duty to SBC.  *See In re Andrews*, 560 B.R. at 445 (analogizing that a "pastor, officer, and Board member . . . owed a fiduciary duty . . . to safeguard [the church's ] funds" in the same manner that "corporate officers owe fiduciary duties to the corporations they serve").  When asked if Stone had a fiduciary duty to act in SBC's best interest, Miller even acknowledged, "I would think so."  Miller also had a fiduciary duty to the church and trustees, as one of four signatories for SBC's checking accounts.[13]  He was the chairman of the Deacons for several years and during the relevant period at issue here. Miller explained that "the deacon ministry . . . always looked out for the welfare of the church."

¶62.   Where there is a fiduciary relationship between parties, a duty to disclose material facts arises.  *Taylor v. S. Farm Bureau Cas. Co.*, 954 So. 2d 1045, 1048 (¶6) (Miss. Ct. App. 2007).  Stone gave Crowther and TCM the $50,000 before the contract was signed, despite his assuring SBC's treasurer Jackie Lindsey that he would not do so.[14]  Stone failed to disclose material facts to the church regarding the lack of bank financing for the construction project.  Stone also admitted that he "made the call" to resume the construction project despite SBC's not having procured financing.  When Stone was asked if he was concerned

---

[13] The other three signatories were SBC's treasurer (Jackie Lindsey), SBC's assistant treasurer (Kiane Hunt), and the chairperson for the board of trustees (Bennie Hairston).

[14] Crowther admitted that none of the funds from the down payment were used for SBC work.  Several cash withdrawals also were made from TCM's general fund in the days following the deposit of the $50,000 check.

29

that SBC "didn't have financing but more money was being expended for the project," Stone replied he "was concerned" but noted that "hindsight is always 20/20." As the Trustees assert, SBC "suffered significant damages as a result" of Stone's breach of his fiduciary duty. Lefoldt, a certified public accountant, estimated that total damages were $1,005,487. When asked if his opinion was that these damages would not have occurred but for the actions of Stone and Miller, he replied, "Exactly, yes."

¶63. There was also evidence that Stone attempted to usurp the Board's designated authority in conducting the church's legal and financial matters with regard to the construction project and to retain that authority for himself and the church deacons. In his June 17, 2013 email to Kiane Hunt, Stone explicitly told Hunt that he did not want to involve the trustees in a meeting with Merchant & Farmers Bank. Moreover, the church deacons began taking collection offerings in 2017, without the trustees' knowledge, and putting those funds into separate Wood Forest Bank accounts. Hairston testified that after the Trustees stopped payments to TCM and filed the lawsuit in 2015, the deacons began taking "the money, every service" under Stone's direction. When Hairston was asked how he knew Stone and Miller were the ones directing the deacons to take up the church offerings, Hairston replied, "Because they were the only ones that would do it. . . . I mean, with all the deacons, except for one, all the deacons do whatever Pastor Stone tells them to do. . . . Whatever he say[s], whatever he tells them to do then that is what they do." Former Deacon Ron Whitson corroborated Hairston's testimony. SBC's treasurer Lindsey also testified church offerings were being redirected:

30

Q. An on Sundays were, were cash collections gathered but not turned over to you and the finance committee?

A. Every Sunday, they were not turned over.[15]

Additionally, Lindsey averred in her affidavit that Stone, "despite the [c]ourt's clear rulings that Stone has any authority to do so, . . . signed an agreement purporting to obligate [SBC] to financial commitments" without the Trustees' or finance committee's approval.[16]

¶64. As discussed, Miller was the chairman of the Deacons during the relevant period. He approved and signed several checks to TCM. Miller (as well as Deacons Randy Murray and John Moore) also signed a change order increasing the TCM contract amount to $1,778,857 without obtaining prior church approval. Hairston and Lindsey averred in their affidavits that the deacons, under Miller's direction, diverted the church collection offerings to the Wood Forest bank account. Based on the sufficiency of the evidence regarding the Appellants' breach of fiduciary duty, I find no error in circuit court's decision to deny the motion for a directed verdict as to this claim.

### iii. Civil Conspiracy

¶65. In Mississippi, the elements of a civil conspiracy are: "(1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Bradley*, 117 So. 3d at 339 (¶32) (quoting *Gallagher Bassett Servs. v. Jeffcoat*, 887

---

[15] SBC's Constitution required that monies collected be given to the SBC treasurer.

[16] The "financial commitments" referred to were with Lamar Advertising for a billboard advertisement costing $600.

So. 2d 777, 786 (¶37) (Miss. 2004)). Additionally, "[f]or a civil conspiracy to arise, the alleged confederates must be aware of the fraud or wrongful conduct at the beginning of the agreement." *Id*. While the "agreement between the parties . . . need not extend to all details of the scheme and may be express, *implied, or based on evidence of a course of conduct.*" *Id*. at (¶33) (emphasis added) (citing 16 Am. Jur. 2d *Conspiracy* § 51). The Appellants assert there was no evidence presented that there was an "agreement" between Stone and Miller or among Stone, Miller, and another party "to accomplish an unlawful purpose or accomplish a lawful purpose unlawfully." They further contend that neither Stone nor Miller "obtained any benefit from any wrongful conduct."

¶66. The Trustees, on the other hand, assert that Stone and Miller committed numerous "acts in furtherance of conspiracy," including Stone's using "his influence and position at the church to gain support for Crowther and TCM despite warnings from the Trustees and SBC's legal counsel." They also note the deacons' diversion of church funds by putting them into the Wood Forest account, which they claim was under Stone's and Miller's direction. The Trustees further argue that there were several "acts of a conspiracy" demonstrated by the evidence. Testimony showed that Stone pushed extremely hard to get the Board to sign TCM's contract despite the concerns raised by the Board. Crowther attended SBC Board and building committee meetings because Stone "invited [him] to show up." Email correspondence from Stone to Crowther on May 20, 2013, contained a discussion about solutions for the "contract signature dilemma," with Stone telling Crowther:

> I've got [a] meeting tonight with trustees and deacons per request of church
> body. At this meeting, trustees will have to decide to resign, sign [the]

contract or be taken before the church to be removed from the board. Also, once this [is] done[,] I'll be working to have our by-laws changed.

When Crowther asked Stone if he should attend the meeting, Stone replied, "No, I wouldn't want to waste any more of your time. The next time I see you, I want to be putting a check in you hand so we can get started." After that meeting, Crowther sent Stone a revised contract with only one space for a single trustee (Barbara Patrick) to sign. According to Christinia Townsend's testimony, the other trustees had only seen the version of the contract with spaces for all of the trustees' signatures. The Trustees argued at trial that Stone and Crowther's intentional "conspiring to change the signatures" of the TCM contract demonstrated Stone's "intent to make a misrepresentation."

¶67. Stone also testified that he "probably" shared the church's "confidential financial information" with Crowther, which he acknowledged was, in hindsight, "problematic."[17]

> Q. So, then moving into 2015, you and Don Crowther start sending e-mails back and forth discussing the private financial information of the church?
>
> A. It is possible, yes.
>
> Q. And you were providing him that information in order for him to help facilitate getting [a loan]?
>
> A. Yes.

On June 12, 2015, Stone emailed Crowther regarding an outstanding TCM invoice for $98,000, telling him that "[Miller] is unable to get cooperation from treasurer [Lindsay]."

---

[17] Stone had been aware from at least the June 2013 call meeting that Crowther had served almost two years in federal prison in another state for bribery. The building committee was disbanded due to its decision "not to go with TCM," and another building committee was formed a few months later.

He also stated in that email, "I'm asking if you would allow me to get this straightened out this afternoon and have your check ready in the afternoon. I'll personally take it to Michael [Self, Crowther's first cousin]."

¶68. Furthermore, after over $400,000 in expenditures to TCM from 2013 to 2015, Hairston requested a church meeting to address concerns, but Stone had the church secretary cancel the meeting because Stone had not given his prior approval. Stone even admitted that he had removed Hairston's request for a special call meeting from the church bulletin. In the meantime, a call meeting was held on October 26, 2015, and the minutes reflect that Stone would be the "primary contact for all building project related issues from this point forward." Stone subsequently held a special call meeting on November 1, 2015, seeking to amend SBC's Constitution by adding a provision that when trustee signatures "are required for legal documents such as obtaining bank loans, selling, buying, or leasing of property, the signature of the [t]rustee Chair and one additional trustee shall suffice." However, if those two persons do "not carry out the will of the church, the Deacon Chair and/or 1 additional trustee or deacon shall suffice." The majority of the church members voted to accept the recommended amendment. Stone confessed that he called the meeting for the express purpose of having the bylaws amended regarding how many trustee signatures would be required to sign legal documents. He agreed with counsel for the Trustees that the amendment was "a mechanism to go around the trustees if they did not proceed." Minutes from a December 2015 church meeting (after the filing of the lawsuit) further reflect Stone stated that "the *pastor* does not report to the [t]rustees" and that "he and his family have given more money to the church

34

than all the current [t]rustees together."

¶69.    There was also direct evidence that the Deacons, chaired by Miller, opened a separate checking account for SBC at Wood Forest Bank in 2017, into which they began depositing church collections.  There was testimony by several witnesses that the Deacons were acting on Stone's behalf.  Lindsey stated that Stone quit coming to her to sign SBC checks and that none of the checks issued from the Wood Forest accounts had been authorized by the trustees or finance committee.[18]

¶70.    Based on the evidence presented, I find no error in the circuit court's ruling that, "based on the state of the record before the jury," there was "sufficient evidence under the law . . . to allow the civil conspiracy claims against [Stone and Miller] to proceed."

### D.    Weight of the Evidence

¶71.    Because the Appellants did not file a motion for a new trial, their argument challenging the weight of the evidence is procedurally barred from appellate review.  *See Cooper v. Lawson*, 264 So. 2d 890, 891 (Miss. 1972) (holding that "before a litigant can avail himself of the contention the verdict is against the weight of the evidence, it is essential that the contention be embodied in a motion for a new trial in the lower court and be passed upon by the trial judge").

### E.    Jury Instructions

¶72.    The Appellants contend that the circuit court erred in giving certain jury instructions regarding the elements for unjust enrichment and civil conspiracy because the instructions

---

[18] Article 9, section 5 of the SBC Constitution states that the church treasurer (Lindsey) "shall sign checks in accordance with church policies and procedures."

35

contained elements outside of what was in the pleadings. Because Appellants' counsel later withdrew his objections to the specified jury instructions as amended by the court, I find these claims are waived for purposes of appeal. *See Coleman v. Ford Motor Co.*, 70 So. 3d 223, 235 (¶42) (Miss. Ct. App. 2011) (finding that because the plaintiff withdrew her objection upon the trial court's modifying the jury instruction language, her objection was "abrogat[ed]").

## CONCLUSION

¶73. I dissent from the majority's finding that the Trustees did not have authority to file the lawsuit against the Appellants without the church's approval. I find the Trustees had standing to file suit to recover the property (funds) belonging to the church and that the circuit court had subject-matter jurisdiction over the action. I would further conclude the other assignments of error are without merit or not preserved for appeal. Accordingly, I would affirm the court's judgment and award of $530,000 against the Appellants.

**GREENLEE AND McDONALD, JJ., JOIN THIS OPINION.**